MILKEY, J.
*730 In 2015, winter storms caused significant damage to a dock in Falmouth (town) owned by Joanne Delapa, as trustee of the Delcor Realty Trust (Delcor). Delcor sought approval from the town conservation commission (commission) to repair the dock, which would involve, inter alia, driving four pilings into a protected wetlands area. Acting in part pursuant to the town wetlands protection by-law and accompanying regulations, the commission denied Delcor's application after finding it deficient in various respects. Delcor brought an action in the nature of certiorari to challenge the commission's denial, see G. L. c. 249, § 4, and on cross motions for judgment on the pleadings, see Mass.R.Civ.P. 12(c), 365 Mass. 754 (1974), a Superior Court judge ruled in the commission's favor. On Delcor's appeal, we affirm the judgment.
Background. 1. The construction of the dock. Delcor acquired the property in June of 1984,[2] and some of the relevant facts predate Delcor's ownership. In July of 1983, a prior owner had obtained approval from the commission to build a dock and associated ramp and float (collectively, the dock). That approval, known as an order of conditions, was issued pursuant to the Wetlands Protection Act, G. L. c. 131, § 40 (act), and to a version of the town's wetlands protection by-law then in effect.[3] The 1983 order of conditions set forth the specifications that the dock was required to meet, and it stated that the work authorized "shall be completed within three years from the date of" its issuance.[4] The order of conditions also stated that it "will not be fully complied with unless and until a duly executed [c]ertificate of [c]ompliance is recorded or registered, as appropriate, in Barnstable [r]egistry of [d]eeds, certifying full compliance."
*476 Delcor or the prior owner also sought certain other approvals for the dock. In a letter dated September 25, 1986 (that is, after the 1983 order of conditions expired), the Army Corps of Engineers *731 (the Corps) indicated its approval of the dock pursuant to what is known as a "general permit." That letter included underscored language that "[w]ork may not begin until [the owner has] returned [an enclosed] form and obtained all other required Federal, State and local authorizations."
On May 5, 1987, Delcor applied to the town building inspector for a building permit to construct the dock. That approval was denied. The building commissioner then wrote a letter to Delcor dated March 1, 1988, in which the inspector noted that an official from the commission had noticed that the dock had been built and stated that removal of the unauthorized structure was required. This paper trail strongly suggests that the dock was built at some unspecified time between May of 1987 (when approval to construct the dock was requested from the building inspector) and March of 1988 (the first documentation that the dock had been built). Consistent with this timeline, but adding little detail, Delcor subsequently filed with the commission a letter that described the dock as having been built in the "late 1980s," and at a July 13, 2016, hearing before the commission, a contractor for Delcor referenced it as having been built "30 years ago." A commission staffer stated at that same hearing that the dock was built in March of 1988, although she did not indicate the basis for such a claim. At another hearing, Delcor's attorney at one point stated that construction of the dock began in September of 1986, and at another point stated that "we don't know when the dock was built." In any event, following the 1988 letter from the building commissioner, the dock apparently was not removed, and the record is silent about any interactions between Delcor and town officials for the next twenty-seven years.
2. The proposed repair of the dock. In 2015, winter storms seriously damaged the dock. As one local official described it, the end of the dock was "mangled," and it is uncontested that part of the dock had sunk. The town conservation agent informed a representative of Delcor that in order to obtain approval to reconstruct the dock, Delcor first would have to close out the 1983 order of conditions by pursuing a certificate of compliance confirming that the dock had been constructed in accordance with the 1983 order. On March 18, 2016, Delcor formally requested the commission to issue a certificate of compliance,[5] and on June 17, 2016, Delcor additionally sought approval to repair the dock by *732 filing what is known as a notice of intent. Specifically, Delcor sought approval to reconstruct the dock by driving four new pilings to replace damaged ones and by making certain repairs to other pilings that would remain. Delcor also sought to put back in place the float it had been using, which measured eighteen feet by eighteen feet.[6] Delcor's filings themselves documented various respects in which the dock, as built, did not conform to what had been approved in the 1983 order of conditions. For example, the dock, as built, was 208 square feet larger than what had been approved.[7] *477 It is uncontested that Delcor's application was unaccompanied by certain documentation identified in the local regulations as "[s]ubmission [r]equirements for all [d]ocks." Falmouth Wetland Regulations (FWR) § 10.16(1)(b).[8] For example, Delcor did not submit a shellfish survey or accurate depictions of water depths in the vicinity of the dock. See FWR § 10.16(1)(b)(3),(6). It appears to be Delcor's position that such documentation is not required for an application to repair an existing dock, at least one allegedly constructed in substantial compliance with an earlier order of conditions. At one of the hearings before the commission, one of Delcor's representatives argued that many docks during the 1980s and the 1990s were constructed after wetlands approval to build them had expired and that the dock had been constructed in "substantial" compliance with the 1983 order of conditions. On this basis, he urged the commission to grant approval as a dock repair.
3. The commission's order. At a meeting held on August 24, 2016, the commission unanimously voted to deny Delcor's application to repair the dock, and a formal written order denying such approval followed a week later. In its transmittal letter, the commission stated that its denial was "without prejudice," and in the order itself, the commission encouraged Delcor to investigate whether a dock could be constructed in accordance with applicable regulatory standards and, if so, to reapply. The order included various factual findings that the commission had made *733 (discussed further below). In the section that followed, labeled "Decision," the commission stated only that it was denying Delcor's request for a permit. Nevertheless, among its enumerated factual findings, the commission also stated that it "is requiring" certain affirmative relief, namely, "the immediate removal of all portions of the dock."
4. The judge's ruling. The commission issued its August 31, 2016, order in part pursuant to the local wetlands protection by-law and regulations, and Delcor brought the current action to appeal those aspects of the order.[9] On an uncontested administrative record assembled by the commission, a Superior Court judge ruled in the commission's favor on cross motions for judgment on the pleadings. The judge did not issue a written memorandum of decision but made the following statements from the bench:
"I [am] affirming the decision of the ... [commission]. It [is] based on substantial[ ] evidence. It [is] not arbitrary or capricious. I [have] reviewed the record. I [have] reviewed all the supporting information."
Discussion. 1. Standard of review. "We review de novo [a] judge's order *478 allowing a motion for judgment on the pleadings under [ Mass.R.Civ.P. 12(c), 365 Mass. 754 (1974) ]." Commonwealth v. Fremont Inv. & Loan, 459 Mass. 209, 212, 944 N.E.2d 1019 (2011), quoting from Wheatley v. Massachusetts Insurers Insolvency Fund, 456 Mass. 594, 600, 925 N.E.2d 9 (2010), S.C., 465 Mass. 297, 988 N.E.2d 845 (2013). In an action in the nature of certiorari challenging a wetlands permit decision made by a conservation commission pursuant to a local by-law, our review is limited at most to whether the commission's decision is supported by substantial evidence in the administrative *734 record, whether the commission's action was arbitrary and capricious, and whether the commission committed an abuse of discretion or other error of law. See generally Fafard v. Conservation Commn. of Reading, 41 Mass. App. Ct. 565, 567-568, 672 N.E.2d 21 (1996) (discussing standards of review applicable to conservation commission permitting decisions). See also Lovequist v. Conservation Commn. of Dennis, 379 Mass. 7, 17, 393 N.E.2d 858 (1979) ; TDJ Dev. Corp. v. Conservation Commn. of N. Andover, 36 Mass. App. Ct. 124, 128, 629 N.E.2d 328 (1994).
2. Regulatory framework. We begin our analysis by reviewing the framework established by the FWR. Those regulations were promulgated by the commission in 1998, and therefore, they were not in place when the dock originally was built. Under the regulations, a permit application is required whenever someone proposes to do work that "will [r]emove, [f]ill, dredge, build upon, degrade, or otherwise [a]lter an [a]rea subject to protection under [the wetlands protection by-law]." FWR § 10.02(2)(a). The term "alter" expressly is defined to include the "[d]riving of piles." FWR § 10.04.
There is a specific section of the regulations that applies to coastal docks.[10] FWR § 10.16(1). Notably, those regulations do not include a specific grandfathering provision, as such, that excluded existing docks from their application.[11] However, some of the specified performance standards apply principally to "new" docks, and apply to "existing" docks in a more limited fashion. For example, the regulations state that "[n]o new docks or piers or extension of an existing dock or pier may be constructed in any portion of [Federal Emergency Management Agency] designated velocity zone (V-Zone) unless the applicant demonstrates that there will be a public benefit from the project." FWR § 10.16(1)(h)(1). As an additional example, there is a prohibition *735 on a dock being located within "[fifty] feet of an area of eel grass" that applies to a "new [dock], replacement, or substantial alteration of an existing dock." FWR § 10.16(1)(h)(5). The regulations do not define what constitutes a "new" dock or an "existing" dock.
At least on their face, many of the regulatory standards apply without regard to whether a dock is considered "new" or *479 "existing." For example, FWR § 10.16(1)(b) sets forth "[s]ubmission [r]equirements for [a]ll [d]ocks," including requirements that applications include -- among many other items -- a shellfish survey and water depth measurements. Additionally, the section governing design specifications and performance standards for docks in recreational harbors includes a strict requirement that dock floats "shall not exceed 100 square feet."[12] FWR § 10.16(1)(d)(3). In an indirect way, the regulations address the extent to which approval is required for the maintenance and repair of those docks that previously had been approved under the regulations. Specifically, the following language is required as a "special condition" in dock approvals issued under the regulations:
"Normal maintenance and repair of a dock or pier is allowed. No extension, alteration or change from the plan of reference is permitted without first obtaining a modification to this permit in accordance with ... [c]ommission procedures."
FWR § 10.16(1)(i)(8).
3. The denial of Delcor's permit application. Delcor argues that the commission's denying the proposed reconstruction of the dock as it had been before the storms damaged it is unsupported by substantial evidence and constitutes an abuse of discretion. That argument gains no traction from the language of the dock regulations discussed above. As noted, those regulations include no grandfathering provision as such. Even though the dock was built before the regulations were adopted, Delcor's proposal falls within the regulations' purview, because Delcor has proposed new activity in the wetlands areas protected by the by-law -- the driving of piles -- that under the terms of the regulations "alter"
*736 those areas by definition. Regardless of whether Delcor's proposal were considered one for a new dock or for the repair of an existing dock, the commission's conclusion that Delcor's application was procedurally and substantively deficient is well supported by the record.[13] Indeed, it is difficult to conceive of how the commission could have approved the proposal where the application both did not comply with mandatory submission requirements and included substantive elements that appear to be at odds with the current performance standards (e.g., the proposed return of a float that has a square footage that is over three times larger than what apparently now is permitted).
Delcor's argument that the commission erred is based not so much on the language of the dock regulations as on a gloss that it alleges the commission has applied to them. Specifically, Delcor maintains that the commission has a policy of summarily approving repairs of existing docks so long as the original construction of the dock was approved and its historic footprint is not expanded. Delcor further argues that its proposal qualifies for such approval because the dock was constructed in substantial compliance with the 1983 order of conditions.
To be sure, the commission did put a great deal of focus during the application process on the extent to which the dock *480 was constructed in compliance with the 1983 order of conditions. This lends some credence to Delcor's suggestion that the commission might have considered its proposal acceptable had it demonstrated compliance with that approval. However, putting aside whether such a gloss can be squared with the actual language of the regulations -- a question we do not reach -- Delcor's argument fails on its own terms. There is substantial support in the record for the commission's conclusion that the dock was not built prior to the expiration of the 1983 order of conditions. Moreover, in any event, the record reveals that the dock, as built, deviated from what was allowed in the 1983 order of conditions in ways that the commission could find significant.[14] Therefore, even were we to assume that the commission were bound by a *737 policy that summary approval should be granted for the repair of existing approved docks, Delcor has not demonstrated that the commission abused its discretion in declining to extend such a policy to Delcor.
We emphasize that our ruling does not depend on whether the dock is considered a new dock or an existing dock, an issue that ultimately may need to be resolved in order to determine which of the various performance standards apply. The record reveals little consideration of that issue to date by either side, and we leave resolution of it until another day.[15]
4. Affirmative relief. One issue remains. As noted, the commission's order not only denied Delcor the requested approval, but also noted that the commission "is requiring the immediate removal" of all of the dock. Delcor argues that the commission's requiring it to take such affirmative action to remedy an alleged past or ongoing violation amounted to "a misuse of the wetlands regulatory process for enforcement purposes." The proper procedure, according to Delcor, would have been to issue an enforcement order. Delcor additionally argues that such an order would be time barred by the statute of limitations set forth at G. L. c. 260, § 2B, or by the doctrine of laches.
For two reasons, we conclude that we need not reach Delcor's arguments that the portion of the commission's decision addressing affirmative relief was procedurally defective and time barred. First, our review of the record reveals that Delcor *481 never raised *738 such issues in Superior Court.[16] See Jancey v. School Comm. of Everett, 421 Mass. 482, 500, 658 N.E.2d 162 (1995) (appellant cannot raise nonjurisdictional argument for first time on appeal), S.C., 427 Mass. 603, 695 N.E.2d 194 (1998). Second, we conclude that the commission's markedly casual reference to affirmative relief does not rise to the level of an enforcement order, that is, an administrative order that has independent force of law. Cf. Director of the Div. of Water Pollution Control v. Uxbridge, 361 Mass. 589, 592-593, 281 N.E.2d 585 (1972) (in action to enforce unappealed administrative enforcement order, only issue is whether administrative action was within agency's jurisdiction). Notably, the commission embedded its statement regarding affirmative relief as a factual finding in what otherwise is merely a ruling in a permitting proceeding. Our conclusion that the commission did not issue a formal enforcement order is reinforced by the fact that the commission did not spell out the legal basis for such an order, an absence that is particularly pronounced to the extent that the commission is left to rely solely on Delcor's noncompliance with local law.[17] Finally, the fact that the commission denied Delcor's proposal without prejudice and expressly invited Delcor to resubmit an application for the dock suggests that the commission did not intend to issue a final binding order to remove the dock.
To be clear, nothing in this opinion should be read as our having concluded that the commission lacked the authority -- based solely on local law -- to require Delcor to remove the rest of the dock in an appropriately instituted administrative or judicial enforcement *739 proceeding.[18] We simply reserve such issues to another day.
Judgment affirmed.

Strictly speaking, it was Joanne Delapa and Anthony F. Delapa, as trustees of a different trust, the Delapa Realty Trust, who acquired the property in 1984. They subsequently transferred the property to Joanne Delapa as trustee of Delcor in 1990. As nothing in this case appears to turn on the distinction between the two trusts, we will -- for convenience -- refer to them both as Delcor.

The record indicates that the town adopted a wetlands protection by-law in 1979 and then replaced that by-law with the current version in 1993. The 1983 order of conditions references the earlier by-law only in passing.

The order stated that the commission could grant limited extensions, but nothing in the record suggests that the commission did so.

The letter is dated March 18, 2015, but it is evident that this is a typographical error.

Delcor also sought after-the-fact approval for a fence that had been built without any approval.

Delcor contends that in at least one respect (the total amount of impervious surface), the deviations from the approved plan were more protective of the wetlands areas.

All references to the FWR herein are to the version effective as of August 15, 1998.

The commission also issued its order pursuant to the act. As to that aspect of the order, Delcor represents, without contradiction from the commission, that Delcor separately filed an administrative appeal with the Department of Environmental Protection (department) and that the department issued a superseding order of conditions approving the repair of the dock pursuant to the act. Delcor in fact included a purported copy of such an approval in its addendum to its brief. However, even though the apparent department approval is dated prior to the Superior Court hearing, neither it nor any arguments based on it were raised to the judge. We therefore allow the commission's motion to strike the department approval from the addendum to Delcor's brief, while noting that nothing in this appeal ultimately turns on this, because it long has been established that municipalities may adopt stricter wetlands standards than those adopted under the act. See Lovequist v. Conservation Commn. of Dennis, 379 Mass. 7, 14-15, 393 N.E.2d 858 (1979).

The parties acknowledged at oral argument that the dock in question would be considered a coastal dock and not an inland dock.

In a postargument submittal, Delcor pointed to language in the regulations stating that their relevant provisions "shall take effect on August 15, 1998[,] and shall apply to all [p]ermit applications ... filed on or after that date ...." FWR § 10.15(1). According to Delcor, "[t]his provision expressly protects pre-1998 projects from being subject to subsequently amended regulations." We remain unconvinced of the import Delcor seeks to place on the quoted language. A boilerplate statement that new regulations do not apply to applications filed before the regulations took effect does not actually address what substantive standards apply to new applications filed with respect to the reconstruction of earlier projects.

It bears noting that, as Delcor acknowledged at oral argument, dock floats are detachable structures that must be removed in the winter season. Thus, each year the float has to be reinstalled in a wetlands area protected by the regulations.

The special condition language quoted above regarding the normal maintenance and repair of docks does not apply, because the dock here indisputably was not approved under the later-adopted regulations. Moreover, the commission was free to conclude that this proposed reconstruction of the dock exceeded "normal maintenance and repair."

It would have been tidier had the commission formally denied Delcor's request for a certificate of compliance. See FWR § 10.05(11)(c) (requiring that denials of requests for certificates of compliance be issued in writing within twenty-one days). However, the commission's order states that the dock was "not in compliance" with the 1983 order of conditions and leaves it abundantly clear that the commission had determined that Delcor was not entitled to a certificate of compliance. Moreover, to the extent that Delcor's claimed aggrievement was the commission's failure to issue a formal ruling on the certificate of compliance, Delcor's appropriate remedy would have been to bring an action in the nature of mandamus. G. L. c. 249, § 5.

At oral argument, the commission asserted that docks that were built without commission approval should not be considered "existing" docks even if they were built long before the applicable regulations were adopted. Compare 310 Code Mass. Regs. § 10.24(7)(c)(2) (2014) (allowing "maintenance, repair and improvement [but not substantial enlargement except when necessary to reduce or eliminate a tidal restriction] of structures, including ... piers ... which existed on November 1, 1987," to be approved as "limited projects" without attention to whether they originally were constructed with approval). Alternatively, there are suggestions in the record that the commission may have been of the view that a particular proposed repair of an existing dock could be so profound that such a proposal properly should be viewed as one for a "new" dock. Such issues should be addressed by the commission in the first instance, e.g., if Delcor accepts the commission's invitation to file a new notice of intent.

Delcor did make a passing argument that any mandated affirmative relief would be time barred on a different ground, namely the statute of limitations set forth in G. L. c. 40A, § 7. Delcor has abandoned that argument on appeal.

Under the act, conservation commissions have express statutory authority to issue administrative enforcement orders. G. L. c. 131, § 40. In the posture of the current appeal, however, the commission is not relying on its authority under that statute, but, instead, acting only pursuant to its authority under the local wetlands protection by-law and regulations. Based apparently on the town's home rule powers, the current by-law purports to empower the commission to issue enforcement orders, and the current regulations reflect that. FWR § 10.08(1)(a). The commission's decision does not explain whether removal of the dock was designed to remedy a wholly past (three decade old) violation, or instead designed to remedy an ongoing violation of local law. To the extent that the commission was relying on the latter theory, the order does not set forth how Delcor currently is violating local law merely by leaving in place what remains of a dock constructed three decades ago and prior to the town's adopting its own independent performance standards.

Nor have we accepted Delcor's suggestion that a conservation commission could never issue a hybrid document that combined both a permit decision and an enforcement order.